No. 84–6667. MONROE *v.* BLACKBURN, WARDEN. C. A. 5th Cir. Certiorari denied.

JUSTICE MARSHALL, with whom JUSTICE BRENNAN joins, dissenting.

I would grant certiorari in this case to resolve the serious questions it raises concerning the scope of a defendant's rights under *Brady* v. *Maryland,* 373 U. S. 83 (1963), during the period following his conviction. While lower courts here have adhered to our precedents in finding petitioner's *Brady* rights to have been violated, the remedy ordered impermissibly dilutes those rights even as it recognizes them.

I

In 1980, after a previous conviction had been overturned, petitioner was brought to trial in New Orleans, once again charged with the 1978 murder of Lenora Collins, a neighbor. The State's case consisted of eyewitness identifications by the victim's two children, both of whom were present when the assailant broke into their mother's bedroom. *State* v. *Monroe,* 397 So. 2d 1258, 1268 (La. 1981). Accepting the testimony of the two children, who at the time of the murder were aged 12 and 11, the jury re-

jected petitioner's alibi, found him guilty of first-degree murder, and unanimously recommended the death sentence.

Six months after petitioner's conviction, but while his appeal was still pending, the New Orleans Police Department was contacted by Detective Joseph Gallardo of the Pontiac, Michigan, Police Department. In the course of investigating one George Stinson's murder of his common-law wife in Michigan, Gallardo had received information suggesting that Stinson may also have murdered his previous wife, three years earlier in New Orleans. His previous wife was Lenora Collins, for whose murder petitioner has been sentenced to die. Two months later, Detective Gallardo again called the New Orleans police. This time, he related to Sergeant John McKenzie the substance of an interview he had had with Stinson's cellmate during which the cellmate had quoted Stinson as first confessing to the Michigan murder and then saying that "the same thing happened" to his first wife, Lenora Collins. Noting that a second source had corroborated this admission, Detective Gallardo also reported having received information that Stinson had threatened Lenora Collins' two children into identifying petitioner as their mother's killer.

All this information was carefully recorded by Sergeant McKenzie, who then dispatched his notes to the detectives who had been involved in the Collins investigation. These notes did not trigger further police inquiries. Neither was their existence ever disclosed to petitioner, who under Louisiana law, could have sought the remand of his case so that he might move in the trial court for a new trial. See *State* v. *Spell*, 388 So. 2d 754 (La. 1980). Indeed, it was not until late 1983 that independent investigation by petitioner's counsel led him to Detective Gallardo, who told of Stinson's incriminating admissions and of the fact that the New Orleans police had long before known of the new evidence. Petitioner thereupon filed a motion in New Orleans Criminal District Court seeking a new trial or, in the alternative, postconviction relief, and also a stay of his execution, then scheduled for January 4, 1984. In this motion, petitioner claimed that the State had unconstitutionally suppressed material, exculpatory evidence. While petitioner was still unaware of the existence of Sergeant McKenzie's actual notes, his counsel's independent efforts in Pontiac enabled him to present the Criminal District Court with all of the information contained in the notes.

The day before petitioner's scheduled date of execution, the Criminal District Court denied petitioner's motion without an evidentiary hearing. Weighing the eyewitness testimony of the victim's children against the affidavit of Stinson's cellmate, the court found that the new evidence was not "so material that it ought to produce a different result then *[sic]* the verdict reached." The Louisiana Supreme Court affirmed hours later, *State ex rel Monroe* v. *Maggio*, 444 So. 2d 606 (1984), although two justices would have granted a stay and ordered a "full evidentiary hearing on the newly discovered evidence issue." The two noted: "Because the death penalty is so final, surely no harm would come from continuing this matter one month to allow the defense to produce witnesses from Michigan, and having the trial court evaluate this evidence." *Ibid.*

After the state court denied relief, the Federal District Court acted upon a habeas petition filed several days earlier, and stayed petitioner's execution. After a hearing in which he heard testimony from Detective Gallardo and Stinson, a Magistrate held that the information allowed to sit undisturbed in New Orleans police files was both improperly suppressed and clearly favorable to petitioner. He recommended that the writ be granted.

The District Court adopted the Magistrate's report, agreeing that the information received from Detective Gallardo was material, exculpatory information that under *United States* v. *Agurs*, 427 U. S. 97 (1976), should have been disclosed to petitioner. The District Court noted that, when coupled with the absence of physical evidence linking petitioner to the murder, the possibility that the eyewitness testimony of the victim's children may have been coerced, and testimony by petitioner's mother placing Stinson at the victim's house on the day of the murder, the suppressed evidence "makes the assertion that Stinson committed the murder plausible." Finding the evidence to "creat[e] a reasonable doubt as to Monroe's guilt that did not previously exist," the court issued the writ. However, having concluded that petitioner's due process rights under *Brady* had been violated, the court did not order that he be released or retried. Rather, it ordered Louisiana

"to grant to Petitioner whatever he was entitled to by way of post-conviction relief during the limitation period provided by Louisiana law for a request for a new trial based on the excul-

patory material which the State courts did not have an opportunity to consider, so that Petitioner may fully and effectively exercise and exhaust his post-conviction rights under Louisiana law."

The Court of Appeals upheld the District Court's choice of remedy. 748 F. 2d 958, 960 (CA5 1984).

## II

In *Brady* v. *Maryland*, 373 U. S. 83 (1963), this Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.*, at 87. In *United States* v. *Agurs, supra,* we recognized that

"there are situations in which evidence is obviously of such substantial value to the defense that elementary fairness requires it to be disclosed even without a specific request. For though the attorney for the sovereign must prosecute the accused with earnestness and vigor, he must always be faithful to his client's overriding interest that 'justice shall be done.'" *Id.*, at 110–111 (footnote omitted).

The message of *Brady* and its progeny is that a trial is not a mere "sporting event"; it is a quest for truth in which the prosecutor, by virtue of his office, must seek truth even as he seeks victory. See *United States* v. *Bagley,* 473 U. S. 667, 675 (1985) (*Brady* rule to "ensure that a miscarriage of justice does not occur").

The quest for truth may not terminate with a defendant's conviction. In Louisiana, a convicted defendant must receive a new trial whenever

"[n]ew and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty." La. Code Crim. Proc. Ann., Art. 851(3) (West 1984).

When the sovereign has decided that justice will be best served by qualifying the finality of a conviction so that a convicted defendant may yet prove his innocence, its attorney is not free to choose

otherwise. And until factfinding proceedings, or the possibility of them, is terminated, the State remains bound by the rules of simple fairness that *Brady* held to be of constitutional dimension. It would hardly make sense to hold the State to a special duty to disclose exculpatory evidence in any adversarial proceeding and then permit the State to avoid this obligation by suppressing the very evidence that would enable a defendant to trigger such proceedings.[1]

In this case there can be no doubt that petitioner's due process rights were violated by the State's failure to disclose to him the information that Detective Gallardo related to the New Orleans police. That the information lay undisturbed in the files of the police and not those of the prosecutor should make no difference. The police files that so readily provided the State with the incriminating material to convict a defendant cannot be turned into a dead-letter repository where evidence of innocence is concerned. See *Moore* v. *Illinois*, 408 U. S. 786, 810 (1972) (MARSHALL, J., concurring in part and dissenting in part); *Smith* v. *Florida*, 410 F. 2d 1349, 1351 (CA5 1969). If by now police are not fully aware of their constitutional obligation to disclose exculpatory evidence even in the absence of a specific request by the prosecutor or defense counsel, this Court should seize this case as a chance to educate them.

This is certainly not a case in which the failure, whether intentional or inadvertent, of the police to alert petitioner to the new information can be attributed to their failure to understand the complexities of the *Brady* rule. At the time the evidence was suppressed, *Agurs* obliged the State to disclose evidence that created "a reasonable doubt that did not otherwise exist" as to defendant's guilt. 427 U. S., at 112. And though the District Court here quite properly made a careful examination of the transcripts from petitioner's second trial before holding the informa-

---

[1] Because in this case, the State suppressed exculpatory evidence while petitioner could still have sought postconviction relief under state law, we need not consider whether the State also deprived petitioner of a federal right to seek habeas relief on the basis of evidence that undermines the sufficiency of the evidence supporting his conviction. See *Dobbert* v. *Wainwright*, 468 U. S. 1231, 1234 (1984) (BRENNAN, J., dissenting from denial of stay and certiorari); Wright & Sofaer, Federal Habeas Corpus for State Prisoners, 75 Yale L. J. 895, 958, n. 223 (1966).

tion from Detective Gallardo to be "material" under the *Agurs* standard,[2] I cannot believe that either an examination of the record or a law degree is needed to appreciate that admissions by a wife-killer incriminating himself in the murder of a former wife cannot be dismissed as idle gossip.

## III

While it was correct to find a *Brady* violation, the District Court appears to have believed that because the Louisiana courts were not given an opportunity to consider the evidence that petitioner was able to develop in the course of his federal habeas proceeding—to wit, Sergeant McKenzie's actual notes of his conversations with Detective Gallardo and the testimony of Detective Gallardo at the habeas hearing—they should now be allowed to decide whether they were a bit hasty in denying petitioner's new trial motion on the eve of his execution. However, the only reason why the state courts never considered this evidence was that they dismissed petitioner's motion without an evidentiary hearing. It was only after the Federal District Court gave petitioner the chance to subpoena the evidence that it came to light. Moreover, as the Court of Appeals observed, the state courts were presented with the "same underlying information" as that contained in Sergeant McKenzie's notes. Having adequately asserted in state courts the basis for his *Brady* claim, petitioner plainly satisfied the exhaustion requirement of federal habeas corpus.

Sending petitioner back to state court with his already exhausted claim is particularly inappropriate here because of the nature of the constitutional violation. If the police had not improperly suppressed the exculpatory information, petitioner would have been able to seek a new trial under Art. 851(3). To require petitioner now to pursue this same remedy is thus to treat the suppressed information just as if it had been "found in a neutral source" and therefore to ignore the "special significance" of the police's obligation to serve the cause of justice. *United States* v. *Agurs*, 427 U. S., at 111. The remedy ordered here removes from the State any incentive to make timely disclosure of material, exculpatory evidence and trivializes the constitutional right

---

[2] It is clear that this evidence would also be material under the standard established by this Court in *United States* v. *Bagley*, 473 U. S. 667 (1985).

recognized in *Brady* and its progeny. The only way this right can be guaranteed is to grant petitioner the remedy that until now has always followed a determination that the *Brady* rule has been violated: He must be released or retried. Because I do not believe this Court should stand by in the face of the dilution of the due process rights of an individual who may not even be guilty of the crime for which he stands under death sentence, I respectfully dissent from the denial of certiorari.