Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
06/30/2017 09:11 AM CDT

State of Nebraska, appellee, v.
Jack E. Harris, appellant.
___ N.W.2d ___

Filed April 7, 2017.    No. S-16-283.

1. **Postconviction: Evidence: Appeal and Error.** In reviewing a trial court's factual findings following an evidentiary hearing in a postconviction case, an appellate court will uphold those findings unless they are clearly erroneous.

2. **Appeal and Error.** An appellate court independently reviews questions of law decided by a lower court.

3. **Constitutional Law.** The determination of constitutional requirements presents a question of law.

4. **Effectiveness of Counsel: Appeal and Error.** When a claim of ineffective assistance of counsel presents a mixed question of law and fact, an appellate court reviews the lower court's factual findings for clear error but independently determines whether those facts show counsel's performance was deficient and prejudiced the defendant.

5. **Pretrial Procedure: Prosecuting Attorneys: Evidence.** Under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), the prosecution has a duty to disclose all favorable evidence to a criminal defendant prior to trial.

6. **Evidence: Impeachment: Words and Phrases.** Favorable evidence includes both exculpatory and impeachment evidence.

7. **Prosecuting Attorneys: Evidence: Due Process.** Suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

8. ____: ____: ____. The Due Process Clause requires the prosecution to disclose favorable material evidence even if a defense counsel did not request it.

9. **Prosecuting Attorneys: Evidence: Due Process: Police Officers and Sheriffs.** A prosecutor has a due process duty to learn of favorable

material evidence known to others acting on the government's behalf in a case. Thus, the State's duty to disclose favorable material evidence exists even if the evidence was known only to police investigators and not to the prosecutor.

10. **Prosecuting Attorneys: Evidence: Verdicts.** The prosecution's undisclosed evidence must be material either to guilt or to punishment, and the prosecution's suppression of favorable evidence violates a defendant's due process right to a fair trial only if the suppressed evidence is sufficiently significant to undermine confidence in the verdict.

11. **Prosecuting Attorneys: Evidence: Judgments: Words and Phrases.** For all claims of prosecutorial suppression of favorable material evidence, the evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.

12. **Trial: Evidence.** Under *Kyles v. Whitley*, 514 U.S. 419, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995), the touchstone of a reasonable probability of a different result is not a sufficiency of the evidence test and does not require a defendant to show that an acquittal was more likely than not with the suppressed evidence. Instead, the question is whether the defendant received a fair trial without the evidence.

13. **Judgments: Evidence: Due Process.** When the State has suppressed more than one item of favorable material evidence, a court must consider, in addition to the three primary components of a due process violation contemplated by *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), whether prejudice occurred from the suppressed evidence collectively, not simply on an item-by-item basis; that is, it must assess its cumulative effect on the fact finder in the light of other evidence.

14. **Pretrial Procedure: Prosecuting Attorneys: Evidence: Words and Phrases.** Whether a prosecutor's failure to disclose evidence results in prejudice depends on whether the information sought is material to the preparation of the defense, meaning that there is a strong indication that such information will play an important role in uncovering admissible evidence, aiding preparation of witnesses, corroborating testimony, or assisting impeachment or rebuttal.

15. **Trial: Evidence: Convictions: Presumptions.** *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), does not apply after a defendant has been convicted in a fair trial and the presumption of innocence no longer applies.

16. **Prosecuting Attorneys: Evidence.** A prosecutor has a duty to learn of favorable material evidence known to others acting on the government's behalf in a case.

Appeal from the District Court for Douglas County: WILLIAM B. ZASTERA, Judge. Affirmed in part, and in part reversed and remanded for further proceedings.

Sarah P. Newell, of Nebraska Commission on Public Advocacy, for appellant.

Douglas J. Peterson, Attorney General, and Kimberly A. Klein for appellee.

WRIGHT, MILLER-LERMAN, CASSEL, STACY, KELCH, and FUNKE, JJ.

FUNKE, J.

## I. NATURE OF CASE

This is Jack E. Harris' appeal from the district court's order dated March 10, 2016, denying him postconviction relief following an evidentiary hearing held on June 28, 2013. The court failed to apply the correct standard to Harris' claim that the State suppressed evidence favorable to him at his 1999 murder trial. The court also failed to address Harris' claims concerning the State's plea agreement with Harris' accomplice. Accordingly, we affirm in part and in part reverse, and remand the cause for the court to resolve Harris' outstanding claims in a manner consistent with the standards set out in this opinion.

## II. BACKGROUND

### 1. FACTS OF CRIME FROM HARRIS' DIRECT APPEAL

In 1999, Harris was convicted of first degree murder and use of a deadly weapon to commit a felony for the 1995 death of Anthony Jones, an Omaha drug dealer. Jones was found dead in his apartment; he had been shot in the head. Harris' alleged accomplice was Howard "Homicide" Hicks, whom Harris had met that summer through Corey Bass, a mutual acquaintance.

In December 1996, Bass was murdered. Officers who were investigating Bass' murder spoke to his brother, who had been incarcerated that year with Harris and a third inmate. Bass' brother told the officers that while Harris and he were incarcerated, Harris admitted that he and someone named "Homicide" had murdered Jones. The third inmate reported that Harris had told him Jones was killed because Jones recognized Harris while Harris was robbing him.

In May 1997, officers arrested Hicks for Jones' murder. After his arrest, Hicks confessed to law enforcement that he and Harris had robbed Jones but that Harris had killed Jones.

The State first tried Harris for Jones' murder in March 1999. The court declared a mistrial because the jury deadlocked. When the State retried Harris in July 1999, the jury found him guilty of first degree murder and use of a deadly weapon to commit a felony. Hicks, Bass' brother, and the third inmate, as well as another man, Robert Paylor, testified against Harris; Paylor also claimed that Harris had told him about Harris' involvement with Jones' murder. Leland Cass, an Omaha police officer, also testified at trial. He testified that while investigating Bass' murder, he interviewed Harris, and that during the interview, Harris had identified Hicks by the nickname "Homicide."[1]

On direct appeal, we rejected Harris' claim that the State failed to disclose Cass' report about the interview with Harris. We held that the court did not abuse its discretion in concluding that Harris had failed to show that the prosecution did not provide him with Cass' report.

### 2. INTERLOCUTORY APPEAL OF FIRST AMENDED MOTION FOR POSTCONVICTION RELIEF

In 2004, we decided Harris' first postconviction appeal.[2] Harris contended that he was entitled to an evidentiary hearing

---

[1] See *State v. Harris*, 263 Neb. 331, 640 N.W.2d 24 (2002).

[2] See *State v. Harris*, 267 Neb. 771, 677 N.W.2d 147 (2004).

on claims regarding the alleged nondisclosure of Cass' police report. As stated above, Cass testified at trial that during a 1996 police interview, Harris identified Hicks by the nickname "Homicide." Part of Harris' defense was that he did not know Hicks and that Hicks had lied when he said that he and Harris had robbed Jones together. The Cass report provided direct statements from Harris that he knew Hicks. We concluded that Harris was entitled to an evidentiary hearing on his claim that the prosecution had failed to disclose the Cass report and whether he was prejudiced by that misconduct if it occurred. Similarly, we held he was entitled to an evidentiary hearing on his claims of ineffective assistance of counsel related to the police report and remanded the matter for further proceedings. We rejected his remaining claims.

### 3. APPEAL OF JUDGMENT ON FIRST AMENDED MOTION FOR POSTCONVICTION RELIEF

On remand, Harris was granted leave to file a second amended motion for postconviction relief. In 2007, we considered Harris' appeal of the judgment on his first amended motion for postconviction relief.[3] Harris again claimed that he was prejudiced by Cass' statement that he knew Hicks by the nickname "Homicide," because this testimony forced Harris' trial counsel to abandon his defense that Harris did not know Hicks.

We stated that it was "now undisputed that although the State agreed to provide Harris with a copy of all police reports, the State failed to provide Harris with a copy of the Cass report prior to trial."[4] But we noted that Harris' trial counsel did not move to continue the trial because of the late discovery of the Cass report, and Harris did not claim that the late disclosure impeded his attorney's ability to prepare a defense. We further stated that because Harris was present at the interview,

---

[3] See *State v. Harris*, 274 Neb. 40, 735 N.W.2d 774 (2007).

[4] *Id.* at 42, 735 N.W.2d at 777.

he knew the report's contents. We concluded that he was not prejudiced by Cass' statement in the light of testimony from three other witnesses who stated that Harris had admitted to the crime.

### 4. First Appeal of Second Motion for Postconviction Relief

In 2008, Harris filed a second motion for postconviction relief, a motion for a new trial, and a motion for a writ of error coram nobis.[5] All three motions primarily rested on his claim that he had discovered new evidence that Hicks testified falsely at Harris' trial and that Hicks had acted alone in the murder. Harris submitted the affidavits of Terrell McClinton and Curtis Allgood in support of the motions. McClinton stated that Hicks had confessed to him that he killed Jones. Allgood "provided details placing Hicks near the crime scene at the time of the murder and corroborated some of the information provided by McClinton."[6] Harris alleged that he was unaware of this information until McClinton contacted Harris' attorney in 2006 and that he was prevented from discovering it because of misconduct by the prosecutor and the State's witness.

The district court agreed to grant Harris an evidentiary hearing, but stated that because it had done so, it would not address his motions for a new trial and a writ of error coram nobis. Before the evidentiary hearing, however, the district court bench for Douglas County recused itself when the prosecutor at Harris' trial was appointed to the bench. In August 2009, a Sarpy County judge was appointed to hear Harris' postconviction motion. In December 2010, the court permitted Harris to file a third amended motion, which added allegations of newly discovered evidence that the prosecutor mispresented

---

[5] See *State v. Harris*, 292 Neb. 186, 871 N.W.2d 762 (2015).

[6] *Id.* at 189, 871 N.W.2d at 765.

or allowed Hicks to misrepresent the nature of Hicks' plea agreement during Harris' trial.[7]

At the start of the evidentiary hearing in June 2013, the court announced that the "matter comes on for a full hearing on [Harris'] Third Amended Motion for Postconviction Relief." However, the record does not reflect that Harris filed the third amended motion for postconviction relief.

After the hearing, the district judge dismissed Harris' postconviction motion without addressing the merits on the basis that Harris had the two other pending motions for relief, i.e., his motions for a new trial and a writ of error coram nobis. The court concluded that those motions did not show that postconviction relief was the sole remedy available to Harris as required under Nebraska's postconviction statutes.[8] Harris subsequently appealed that ruling.

In December 2015, we held that when a district court is presented with simultaneous motions for postconviction relief and some other type of relief, the court must dismiss the postconviction motion without prejudice when the allegations, if true, would warrant relief through the alternative remedy that the defendant sought. But if the court determines that no other remedy is available and the postconviction motion is not procedurally barred under § 29-3003, the court must consider the motion on the merits.

We concluded that Harris' motion for a new trial was not an available remedy because the motion was time barred. We also concluded that a writ of error coram nobis was not an available remedy for Harris' claim that a witness testified falsely. Because Harris could not obtain relief through the alternative remedies he sought, we held that the court erred in dismissing his motion for postconviction relief. We reversed the court's judgment and remanded the cause for the court to consider the merits of Harris' postconviction motion. The district court's

---

[7] *Harris, supra* note 5.

[8] See Neb. Rev. Stat. § 29-3003 (Reissue 2016).

ruling on the merits presents the issues now currently before this court.

### 5. Proceedings on Remand

On remand from Harris' first appeal of his latest motion for postconviction relief, the district court did not conduct a new evidentiary hearing. Instead, the court considered the evidence presented at the 2013 evidentiary hearing.

At the 2013 hearing, at Harris' request and with the State's consent, the court took judicial notice of the bill of exceptions for Harris' second trial in 1999. Nonetheless, in this appeal, the parties cite exhibit numbers referencing the bill of exceptions from Hicks' 1999 trial and quote excerpts from the trial, all of which are not part of the record before us. The only record before us is the evidence offered at the 2013 evidentiary hearing. Most of the facts that we set out below either are in the record from the 2013 postconviction hearing or come from our previous records and decisions in this case, which we judicially notice.[9]

As mentioned above, in Harris' third amended motion, he added the allegation that "the prosecutor engaged in misconduct by misrepresenting or allowing Hicks to misrepresent the nature of the plea agreement at Harris' trial."[10] Relatedly, Harris alleged that the prosecutor failed to disclose impeachment evidence regarding the State's true plea agreement with Hicks. Harris contended that contrary to the prosecutor's representations, the true plea agreement included the following terms: (1) The prosecutor would meet with Hicks' attorney and the judge and make recommendations for lenient sentencing; (2) neither the prosecutor nor Hicks' attorney would object to Harris' waiver of a presentence investigation report, which would have alerted the judge that Paylor had identified Hicks as his shooter; (3) the prosecutor would make a statement

---

[9] See, e.g., *State v. Marshall*, 272 Neb. 924, 725 N.W.2d 834 (2007).

[10] *Harris, supra* note 5, 292 Neb. at 189, 871 N.W.2d at 765.

regarding Hicks' sincere remorse for his involvement in the case of Jones' homicide; (4) the prosecutor would not object to Hicks' attorney's recommendations for sentencing nor object to certain illegal credit for time served on different charges; and (5) the prosecutor would advise the court that she had spoken to Jones' family members and that they did not object to her recommendations.

However, in the court's 2016 order denying relief, the court did not address Harris' claims regarding Hicks' plea agreement. Instead, the court's order stated that Harris had filed a "second" motion for postconviction relief and addressed the claims raised in only that second motion.

The court specifically ruled upon Harris' claims that the State suppressed information in the possession of Allgood before Harris' trial and information in the possession of McClinton before Harris' trial, direct appeal, or postconviction proceedings. To address Harris' claims and the court's rulings, we must provide more factual context.

### 6. Additional Facts

In 2006, McClinton wrote Harris' postconviction attorney with information that he had obtained in prison about homicides in Omaha, including Jones' homicide. McClinton wrote that Hicks had told him about killing Jones and walking to Allgood's house afterward. McClinton refused to be transported to court for the 2013 evidentiary hearing, but the court received his 2007 affidavit into evidence.

In his affidavit, McClinton stated that for an unspecified period, he had worked for Bass, who was a major drug dealer in Douglas County. McClinton would "administer beatings" to people who owed Bass money or drugs. McClinton said that Hicks killed people for Bass and was referred to as "Homicide" because "he will leave you dead." McClinton said that in 2001, he met with Hicks in Omaha and Hicks talked about some of Hicks' crimes.

McClinton's affidavit further stated that Hicks told McClinton that despite his testimony at Harris' trial, Hicks had shot Jones. Hicks said that he had waited outside Jones' apartment door until Jones came home and then took Jones inside to rob him. Hicks said he shot Jones twice because his gun misfired. But Hicks could not find Jones' drugs and needed to walk to a telephone booth to call Bass and ask where Jones kept them. Hicks put a vase in the doorway so he could get back inside. After Bass told Hicks where to look, he returned to Jones' apartment and found the drugs. Then he walked to Allgood's house, but Allgood kicked him out because he got mud on the floor.

Finally, McClinton's affidavit stated that he "tried" to call the gang unit with this information in 2004, contacted a federal agent in 2005, and wrote the county attorney about it in June 2006.

McClinton's information led Harris' postconviction attorney to Allgood, who signed an affidavit in 2007. In that affidavit, Allgood stated that in 1995, he lived within blocks of Jones' apartment. He said that he installed hydraulic suspensions on cars, that some of his customers were people involved in gangs and illegal drugs, and that it was not unusual for these customers to "'hang out'" at his house. Allgood said that Bass, a "known street gangster" and major drug dealer, and Hicks were among the customers who would spend time at his house. He also knew Harris. He said that he would sometimes see Bass with Harris but would not see Hicks with Harris. Allgood said the following regarding August 22, 1995: It was a rainy day; Bass and another person were at Allgood's house, and Harris was not there. Around 10:30 p.m., Hicks ran into Allgood's kitchen without knocking and appeared very agitated. He was wearing dark clothes and had gloves in his back pocket. Allgood was upset because Hicks was tracking mud onto the floor. He overheard Hicks tell Bass that "'it was handled.'" Hicks and Bass talked inside for about 15 minutes; then they went outside and left about 10 minutes later.

At the 2013 hearing, Allgood testified that the night of Jones' murder had stood out to him because he learned about the murder shortly afterward. He said that Hicks had burst into his kitchen like "he was just coming in to start a fight or something." Allgood told Hicks to take his muddy boots outside, but Hicks insisted on talking to Bass. Hicks was erratic in speaking to Bass while they were in the kitchen, but when Allgood heard Hicks say that "[i]t was handled," Bass seemed happy.

Allgood further testified that later, in 1996 or 1997, a plainclothes police officer, accompanied by another man, came to ask him questions about Jones' homicide. Allgood did not know Jones but knew of him. He believed that Jones was also involved in illegal drug activities with Bass. Allgood could not remember the officer's name but said that he identified himself as a police officer and took notes. The officer gave Allgood a "brief synopsis" of the homicide investigation and asked Allgood if he had ever seen Harris, Hicks, and Bass "all together around that time at [Allgood's] house." Allgood told the officer that he did not see them all together. But he specifically testified that he told the officer he "saw [Bass] and Hicks together that night."

However, on cross-examination, the prosecutor asked Allgood the following questions, and Allgood gave the following answers:

Q. The information in your affidavit pertaining to when . . . Hicks came into your house that night in August of 1995 —

A. Yes, sir.

Q. — did you tell the police officer about that?

A. No. Because he didn't ask me that question.

Q. Did you tell anybody in law enforcement about that until you revealed it when [postconviction counsel's] investigator came and talked to you?

A. No. I didn't.

Q. Your wife? Anybody?

A. No.

Allgood said that he did not tell the police investigator about the information in his affidavit because he had not put the facts all together and it would have hurt his business to talk about some things to police officers.

At the 2013 hearing, Harris offered evidence to show that his trial attorney did not receive any police reports about Allgood and that the prosecutor likely knew about him. Specifically, Harris presented evidence that on December 16, 1996, Officer W. Agnew wrote a "supplementary" police report for the investigation into the murder of Bass. In the report, Agnew stated that he had been asked to find out if Harris knew anything about Bass' death. A box was drawn around text in which Agnew reported that in November 1996, Harris had traded in a "GMC Blazer [for a] Mercedes Benz." The information was relevant because Hicks had testified that Harris owned a Blazer.

After the first day of Harris' second trial, the prosecutor faxed six pages to Harris' attorney: a cover sheet, an unfiled notice to seek endorsement of Agnew and Allgood as witnesses, and all four pages of Agnew's supplemental report. But the original fax information at the top of Agnew's supplemental report showed that his report was part of 29 pages that were faxed to the prosecutor on the morning of July 19, 1999. The prosecutor filed the notice to endorse Agnew and Allgood on July 20.

Harris' attorney could not recall receiving Agnew's report or speaking to the prosecutor about it. Agnew's report did not mention Allgood's name. But Harris' attorney believed that because of the prosecutor's notice to endorse Agnew and Allgood, he would have spoken to the prosecutor about these witnesses. However, he said that if the prosecutor had indicated that she would not call Allgood, he would not have worried about him. He stated that if he had known about the statements in Allgood's 2007 affidavit, he would have investigated to determine whether Hicks "was with others or alone in terms of the story that he related in the first and second trials." He

stated that this information would have undermined Hicks' credibility and reinforced Harris' alibi.

Harris testified that during his second trial, the prosecutor sat at the same table with the defense. He stated that he could see the prosecutor's notice to endorse Agnew as a witness and that Agnew worked in the police department's gang unit. Harris asked the prosecutor what Agnew would say, because Harris was not a gang member. The prosecutor asked Harris whether he had owned a "little Blazer," because Hicks had said he did. Harris told the prosecutor that he had owned a "big Blazer," and the prosecutor said she would not call anyone about the Blazer. When Harris asked what Allgood would say, the prosecutor responded that she was not going to use him. When Harris asked his attorney what Allgood would say, his attorney said he did not have any paperwork on Allgood.

In her 2011 deposition, the prosecutor testified that she could not recall why she had endorsed Agnew or Allgood. She said that in general, she would endorse a witness to "be on the safe side," if she had gotten some information from a police report that caused her to think "maybe there might be something." She also acknowledged the existence of a "gang intelligence unit" in the police department when she was a prosecutor. She said that as a prosecutor, she did not want to know about any of the unit's collected information "that [she could not] tell the defense attorney," and that the unit's policy was not to tell her anything "unless it can be disclosed. . . . If they think it's too sensitive, then [they] don't tell [her]."

## 7. COURT'S ORDER

In its 2016 ruling on Harris' motion for postconviction relief, the district court determined that Harris was not entitled to relief on his claims that (1) the prosecutor failed to disclose McClinton's statements to Harris' trial counsel, appellate counsel, or postconviction counsel and (2) if Harris' trial counsel knew about McClinton's information, counsel provided ineffective assistance in failing to call McClinton as

a witness. The court found that there was no evidence that the prosecutor or the defense attorney knew about McClinton's existence: "Given that lack of knowledge, it would be impossible for either of them to know, suspect, look into or learn about the potentially exculpatory evidence [McClinton] recites in his letter to [Harris' postconviction counsel] or in his affidavit."

The court also concluded that Harris was not entitled to relief on his claims that (1) the State failed to disclose Allgood's statements to Harris and (2) if Harris' trial attorney knew about Allgood's statements, counsel provided ineffective assistance in failing to call Allgood as a witness:

> The record does contain some evidence to indicate that the prosecutor knew about . . . Allgood's physical existence and the possibility that he possessed at least some information that was of potential utility in [Harris'] original trial. However, there is no information contained within the record and evidence currently before this Court to indicate that at any time prior to and/or during [Harris'] trial did either the State . . . or defense counsel . . . know about any potential exculpatory information in . . . Allgood's possession. More specifically, there is no evidence before this Court for it to make a determination that [the prosecutor] or [defense attorney] possessed even the slightest bit of information about the potentially exculpatory information contained within . . . Allgood's affidavit . . . until it was brought to their attention as a result of the filing of this postconviction motion in January of 2008. Further, . . . Allgood's testimony at the hearing held on June 28, 2013, corroborates the fact that he did not share, hint at, or in any other manner reveal the potentially exculpatory information contained in [his affidavit] with anyone, including representatives of the State, the defense or any members of law enforcement. . . . Accordingly, the Court finds that this contention is without merit.

As stated, the court did not address Harris' claims regarding Hicks' plea agreement.

## III. ASSIGNMENTS OF ERROR

Harris assigns that the court erred in overruling his third amended motion for postconviction relief for the following reasons: (1) Harris' convictions were procured through prosecutorial misconduct, which violated his right to due process; (2) the court failed to address Harris' claim that the prosecutor improperly misrepresented the nature of Hicks' plea agreement; and (3) Harris' trial counsel provided ineffective assistance.

## IV. STANDARD OF REVIEW

[1-3] In reviewing a trial court's factual findings following an evidentiary hearing in a postconviction case, an appellate court will uphold those findings unless they are clearly erroneous.[11] We independently review questions of law decided by a lower court.[12] The determination of constitutional requirements presents a question of law.[13]

[4] Likewise, when a claim of ineffective assistance of counsel presents a mixed question of law and fact, we review the lower court's factual findings for clear error but independently determine whether those facts show counsel's performance was deficient and prejudiced the defendant.[14]

## V. ANALYSIS

Before addressing the parties' specific arguments regarding Harris' suppression of evidence claims, we set out the standards that guide our review of those claims.

---

[11] See *State v. Saylor*, 294 Neb. 492, 883 N.W.2d 334 (2016).

[12] See, *State v. Benavides*, 294 Neb. 902, 884 N.W.2d 923 (2016); *Saylor, supra* note 11.

[13] See, *State v. Smith*, 292 Neb. 434, 873 N.W.2d 169 (2016); *State v. Castillo-Zamora*, 289 Neb. 382, 855 N.W.2d 14 (2014); *State v. Boslau*, 258 Neb. 39, 601 N.W.2d 769 (1999).

[14] See *State v. Dubray*, 289 Neb. 208, 854 N.W.2d 584 (2014).

1. Prosecution's Duty to Disclose Favorable
Evidence and Standard of Materiality
to Show Due Process Violation

[5-7] In *Brady v. Maryland*,[15] the U.S. Supreme Court held that the prosecution has a duty to disclose all favorable evidence to a criminal defendant prior to trial. Favorable evidence includes both exculpatory and impeachment evidence.[16] The "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."[17]

[8,9] Since deciding *Brady*, the U.S. Supreme Court has clarified that the Due Process Clause requires the prosecution to disclose favorable material evidence even if a defense counsel did not request it.[18] Moreover, a prosecutor has a duty to learn of favorable material evidence known to others acting on the government's behalf in a case.[19] Thus, the State's duty to disclose favorable material evidence exists even if the evidence was "'known only to police investigators and not to the prosecutor.'"[20]

---

[15] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). Accord, e.g., *State v. Jenkins*, 294 Neb. 684, 884 N.W.2d 429 (2016); *State v. Parnell*, 294 Neb. 551, 883 N.W.2d 652 (2016).

[16] See *United States v. Bagley*, 473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985), citing *Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972). Accord, e.g., *Jenkins, supra* note 15; *State v. Castor*, 257 Neb. 572, 599 N.W.2d 201 (1999).

[17] *Brady, supra* note 15, 373 U.S. at 87.

[18] *Strickler v. Greene*, 527 U.S. 263, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999), citing *United States v. Agurs*, 427 U.S. 97, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976). Accord, *State v. Phillips*, 286 Neb. 974, 840 N.W.2d 500 (2013); *State v. Jackson*, 275 Neb. 434, 747 N.W.2d 418 (2008).

[19] *Strickler, supra* note 18, quoting *Kyles v. Whitley*, 514 U.S. 419, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995).

[20] *Id.*, 527 U.S. at 280-81, quoting *Kyles, supra* note 19.

[10] But the prosecution's undisclosed evidence must be material either to guilt or to punishment, and the prosecution's suppression of favorable evidence violates a defendant's due process right to a fair trial only if the suppressed evidence is sufficiently significant to undermine confidence in the verdict.[21]

[11] In *United States v. Bagley*,[22] the Supreme Court held that the same standard of materiality applies to undisclosed favorable evidence whether a defense attorney made no request, a general request, or a specific request for it.[23] The Court adopted the standard of materiality that it had relied on in *Strickland v. Washington*[24] for all claims of prosecutorial suppression of favorable material evidence: "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."[25]

[12] Under *Kyles v. Whitley*,[26] the touchstone of a "'reasonable probability'" of a different result is not a sufficiency of the evidence test and does not require a defendant to show that an acquittal was more likely than not with the suppressed evidence. Instead, the question is whether the defendant received a fair trial without the evidence:

> A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial." . . .

---

[21] *Brady, supra* note 15; *State v. Lykens*, 271 Neb. 240, 710 N.W.2d 844 (2006), quoting *Strickler, supra* note 18.

[22] *Bagley, supra* note 16.

[23] See *Lykens, supra* note 21.

[24] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Accord *Jackson, supra* note 18.

[25] *Bagley, supra* note 16, 473 U.S. at 682.

[26] *Kyles, supra* note 19, 514 U.S. at 434.

. . . One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.[27]

Thus, if the *Bagley* standard of materiality is satisfied—i.e., the defendant shows that the prosecution's failure to disclose favorable evidence prejudiced the defendant by undermining confidence in the outcome of the trial[28]—the suppression cannot be found harmless.[29]

As we have recognized,[30] in *Strickler v. Greene*,[31] the Supreme Court set out the three primary components of a *Brady* violation. First, the "evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching."[32] Second, the "evidence must have been suppressed by the State, either willfully or inadvertently."[33] Third, prejudice from the suppression "must have ensued."[34]

[13] But when the State has suppressed more than one item of favorable material evidence, a court must also consider whether prejudice occurred from the suppressed evidence

---

[27] *Id.*, 514 U.S. at 434-35 (citation omitted) (cited in *Lykens, supra* note 21). Accord *Castor, supra* note 16.

[28] See *Kyles, supra* note 19. See, also, *Strickler, supra* note 18 (Souter, J., concurring in part, and in part dissenting; Kennedy, J., joins in part); *Lykens, supra* note 21, quoting 5 Wayne R. Lafave et al., Criminal Procedure § 24.3(b) (2d ed. Supp. 2006).

[29] See *Kyles, supra* note 19. Accord *Lykens, supra* note 21.

[30] See *Lykens, supra* note 21.

[31] *Strickler, supra* note 18.

[32] *Id.*, 527 U.S. at 281-82.

[33] *Id.*, 527 U.S. at 282.

[34] *Id.*

collectively, not simply on an item-by-item basis; that is, it must assess its cumulative effect on the fact finder in the light of other evidence.[35]

[14] Under Neb. Rev. Stat. § 29-1912 (Reissue 2008), Nebraska's primary discovery statute in criminal cases, whether a prosecutor's failure to disclose evidence results in prejudice depends on whether the information sought is material to the preparation of the defense, meaning that there is a strong indication that such information will play an important role in uncovering admissible evidence, aiding preparation of witnesses, corroborating testimony, or assisting impeachment or rebuttal.[36] Accordingly, we have analyzed whether a prosecutor failed to disclose material evidence under § 29-1912 in an appeal from a postconviction proceeding,[37] which is a remedy available only for violations of a defendant's constitutional rights.[38]

Having set out the relevant standards for evaluating a defendant's suppression claims, we turn to the parties' arguments regarding Harris' specific claims.

---

[35] See, *Kyles, supra* note 19; *Castor, supra* note 16. Accord, e.g., *Cone v. Bell*, 556 U.S. 449, 129 S. Ct. 1769, 173 L. Ed. 2d 701 (2009); *Banks v. Dretke*, 540 U.S. 668, 124 S. Ct. 1256, 157 L. Ed. 2d 1166 (2004); *Rhoades v. Henry*, 638 F.3d 1027 (9th Cir. 2011); *Lambert v. Beard*, 633 F.3d 126 (3d Cir. 2011), *vacated on other grounds and remanded for reconsideration, Wetzel v. Lambert*, ___ U.S. ___, 132 S. Ct. 1195, 182 L. Ed. 2d 35 (2012); *Rocha v. Thaler*, 619 F.3d 387 (5th Cir. 2010); *Doan v. Carter*, 548 F.3d 449 (6th Cir. 2008); *Monroe v. Angelone*, 323 F.3d 286 (4th Cir. 2003); *Boyette v. Lefevre*, 246 F.3d 76 (2d Cir. 2001).

[36] *State v. Kula*, 252 Neb. 471, 562 N.W.2d 717 (1997).

[37] See *Jackson, supra* note 18.

[38] See, Neb. Rev. Stat. § 29-3001 (Reissue 2016); *State v. Starks*, 294 Neb. 361, 883 N.W.2d 310 (2016).

## 2. STATE'S DUTY TO DISCLOSE FAVORABLE EVIDENCE DID NOT APPLY TO INFORMATION IT RECEIVED FROM MCCLINTON AFTER HARRIS WAS CONVICTED AND SENTENCED

According to McClinton's affidavit, 2004 was the first year that he "tried" to contact any law enforcement officers with information about Hicks' confessing to killing Jones. Harris was convicted and sentenced in 1999. We decided his direct appeal in 2002 and his first postconviction appeal in 2004. Harris does not dispute the court's finding that the prosecutor did not know McClinton even existed during Harris' trial or sentencing. But Harris argues that this court should interpret Nebraska's Constitution and postconviction statutes to require an ongoing duty for the State to disclose exculpatory informa-tion that it learns about after a defendant is convicted and sen-tenced. It relies on the U.S. Supreme Court's 2009 decision in *District Attorney's Office for Third Judicial Dist. v. Osborne*.[39] But *Osborne* does not support Harris' argument.

Long before *Osborne*, in a 1976 civil rights case, the Supreme Court stated that at a trial, a prosecutor's duty to dis-close favorable evidence is enforced by due process require-ments, but that after a trial has concluded, the prosecutor is bound by his or her ethical duties.[40] Later, in a 1986 habeas case, the Court declined to decide whether *Brady* requires a prosecutor to disclose favorable evidence that the prosecu-tor does not learn about until after a defendant is convicted and sentenced.[41] Since then, various federal courts have held that when state investigators or prosecuting officers know of

---

[39] *District Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 129 S. Ct. 2308, 174 L. Ed. 2d 38 (2009).

[40] See *Imbler v. Pachtman*, 424 U.S. 409, 96 S. Ct. 984, 47 L. Ed. 2d 128 (1976).

[41] See *Monroe v. Blackburn*, 476 U.S. 1145, 106 S. Ct. 2261, 90 L. Ed. 2d 706 (1986) (mem.) (Marshall, J., dissenting; Brennan, J., joins).

favorable evidence before or during a defendant's trial, the State's duty to disclose the evidence continues to posttrial proceedings that are determinative of guilt or innocence.[42] But in the absence of clear guidance, lower federal courts had been split on whether *Brady* requirements extend to favorable evidence that the prosecution does not learn about until after a trial is completed.[43] In *Osborne*, the U.S. Supreme Court effectively resolved that split.

In *Osborne*, a state prisoner sued Alaska state officials in a civil rights action for violating his due process right to obtain biological evidence that was used to convict him of kidnapping and assault offenses. He wanted the evidence to perform DNA testing that was unavailable at the time of his trial. The Ninth Circuit extended a previous holding that the *Brady* disclosure requirements continue to posttrial proceedings based upon a fundamental fairness requirement that the State must come forward with any exculpatory evidence in its possession when a habeas petitioner needs it to make a colorable showing of actual innocence.[44] The circuit court noted that the prisoner had a "potentially viable" state constitutional claim of "actual innocence," and it relied on the "well-established assumption" that a similar claim arose under the federal Constitution and concluded that as a result, these potential claims extended some of the State's *Brady* obligations of disclosure of favorable evidence to the postconviction context.[45] However, the circuit court declined to set out a standard of materiality because it

---

[42] See, e.g., *Steidl v. Fermon*, 494 F.3d 623 (7th Cir. 2007); *Smith v. Roberts*, 115 F.3d 818 (10th Cir. 1997).

[43] Compare *Tennison v. City and County of San Francisco*, 570 F.3d 1078 (9th Cir. 2009), and *Smith, supra* note 42, with *U.S. v. Maldonado-Rivera*, 489 F.3d 60 (1st Cir. 2007), and *U.S. v. Jones*, 399 F.3d 640 (6th Cir. 2005).

[44] See *Thomas v. Goldsmith*, 979 F.2d 746 (9th Cir. 1992).

[45] *Osborne v. Dist. Atty's Office for Third Judicial*, 521 F.3d 1118, 1130-31 (9th Cir. 2008), *reversed on other grounds, Osborne, supra* note 39.

concluded the facts of the case were strong enough to warrant disclosure regardless of the standard.

[15] The U.S. Supreme Court reversed. It agreed that Alaska's statute for newly discovered evidence had created a liberty interest for convicted individuals to prove their innocence and that a state-created right can sometimes "'beget yet other rights to procedures essential to the realization of the parent right.'"[46] But it concluded that the Ninth Circuit "went too far . . . in concluding that the Due Process Clause requires that certain familiar preconviction trial rights be extended to protect [the respondent's] postconviction liberty interest."[47] The Court specifically held that *Brady* does not apply after a defendant has been convicted in a fair trial and the presumption of innocence no longer applies:

> A criminal defendant proved guilty after a fair trial does not have the same liberty interests as a free man. At trial, the defendant is presumed innocent and may demand that the government prove its case beyond reasonable doubt. But "[o]nce a defendant has been afforded a fair trial and convicted of the offense for which he was charged, the presumption of innocence disappears." . . . "Given a valid conviction, the criminal defendant has been constitutionally deprived of his liberty." . . .

> The State accordingly has more flexibility in deciding what procedures are needed in the context of postconviction relief. "[W]hen a State chooses to offer help to those seeking relief from convictions," due process does not "dictat[e] the exact form such assistance must assume." . . . [The respondent's] right to due process is not parallel to a trial right, but rather must be analyzed in light of the fact that he has already been found guilty at a fair trial, and has only a limited interest in postconviction relief. *Brady* is the wrong framework.

---

[46] *Osborne, supra* note 39, 557 U.S. at 68.

[47] *Id.*

    Instead, the question is whether consideration of [the respondent's] claim within the framework of the State's procedures for postconviction relief "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental," or "transgresses any recognized principle of fundamental fairness in operation."[48]

The Court concluded that Alaska's procedures were sufficient to vindicate its state-created right to show actual innocence without the need to extend the *Brady* disclosure requirements to postconviction actions.

    Harris contends that Nebraska's "postconviction procedures and new trial provisions are fundamentally inadequate to vindicate the substantive rights provided."[49] At the time of his conviction and sentencing, pursuant to Neb. Rev. Stat. § 29-2103(4) (Reissue 1995), a motion for a new trial resting on newly discovered evidence had to be filed within 3 years of the defendant's conviction.[50]

    Since Harris' conviction, the Legislature has amended Nebraska's statutes dealing with motions for a new trial.[51] Effective August 30, 2015, a motion for new trial resting on newly discovered evidence must be brought within 5 years of the verdict, "unless the motion and supporting documents show the new evidence could not with reasonable diligence have been discovered and produced at trial and such evidence is so substantial that a different result may have occurred."[52]

    But even before the Legislature amended Nebraska's statutes dealing with a motion for a new trial, this court had held open the possibility of postconviction relief for a strong

---

[48] *Id.*, 557 U.S. at 68-69 (citations omitted).

[49] Reply brief for appellant at 11-12.

[50] Compare § 29-2103(4) (Reissue 2016).

[51] See 2015 Neb. Laws, L.B. 245, §§ 1 and 2.

[52] § 29-2103 (Reissue 2016).

showing of actual innocence. We have explained that a prisoner's claim that the State was incarcerating an innocent person who could no longer present newly discovered evidence would raise a potential due process violation.[53] *Osborne* did not establish a new substantive right; the Court was merely evaluating whether a state's procedures, specifically Alaska's, were sufficient to "vindicate its state right to postconviction relief."[54]

Harris does not claim that McClinton's affidavit was sufficiently compelling to show his actual innocence in a postconviction proceeding.[55] Nor does Harris claim that Nebraska's procedures are inadequate to protect his statutory postconviction rights. Instead, he claims that Nebraska's statutory rights are inadequate to support a purported right to have the State disclose any exculpatory information that it receives long after a case is closed.

After a case is closed, there may be ethical duties that require prosecutors to take action upon learning of evidence that creates a reasonable likelihood the defendant did not commit the crime.[56] But Nebraska's postconviction statutes provide relief only for constitutional violations that render a conviction void or voidable.[57]

Harris cites no authority to support his argument that the 3-year time limitation for claims of newly discovered evidence violated a recognized principle of fundamental fairness. And his claim that he has a substantive right to have the State disclose exculpatory evidence that it learns about after a final judgment directly conflicts with the U.S. Supreme Court's holding in *Osborne* that *Brady* does not apply to

---

[53] See, e.g., *State v. Dubray*, 294 Neb. 937, 885 N.W.2d 540 (2016).

[54] *Osborne, supra* note 39, 557 U.S. at 69.

[55] See *id.*

[56] See Model Rules of Prof. Conduct Rule 3.8(g) (ABA 2014).

[57] *State v. DeJong*, 292 Neb. 305, 872 N.W.2d 275 (2015).

postconviction proceedings.[58] We conclude that the court did not err in denying Harris relief on his claim that the State failed to disclose information McClinton allegedly reported to law enforcement officers in 2004 or later.

### 3. Court Applied Wrong Standards in Determining That State Did Not Violate Duty to Disclose Information About Allgood

The district court concluded that Harris was not entitled to relief on his claims that the State failed to disclose Allgood's statements to a police officer in 1996 or 1997. The court reasoned that the evidence failed to show that the prosecutor "possessed even the slightest bit of information about the potentially exculpatory information contained within . . . Allgood's affidavit." Additionally, the court found that Allgood's testimony showed that he did not reveal any potentially exculpatory information with anyone, "including representatives of the State, the defense or any members of law enforcement."

#### (a) Parties' Contentions Regarding Allgood's Statements

Harris argues that the evidence shows that the prosecutor's practice was to allow law enforcement officers to dictate what information the prosecution would see on a case. Despite this practice, Harris contends that the prosecutor would not have endorsed Allgood as a witness without knowing something about his potential testimony and that the evidence strongly suggests the prosecutor received this information in the missing pages the police department faxed to the prosecutor on July 19, 1999.

Harris also contends that Allgood's statements to the officer who interviewed him about Jones' homicide constituted

---

[58] See, *Gavitt v. Born*, 835 F.3d 623 (6th Cir. 2016); *Whitlock v. Brueggemann*, 682 F.3d 567 (7th Cir. 2012).

potentially exculpatory evidence and impeachment evidence. He argues that if his trial counsel had known about Allgood's statements to the officer, he would have contacted him and learned about the rest of the story that was set out in Allgood's affidavit. Harris further contends that Allgood's statements to the officer would have corroborated Harris' alibi defense and permitted him to impeach Hicks' credibility. He argues that Allgood's statements to the officer contradicted Hicks' testimony that he and Harris drove around town together after robbing Jones.

The State contends that Allgood's statements to the officer—i.e., that he did not see Hicks, Harris, and Bass together the night of the murder, but did see Hicks and Bass together—did not constitute evidence favorable to Harris because they were neither exculpatory nor impeaching. It argues that even if Harris' trial counsel had investigated and learned that Hicks was at Allgood's house the night of the murder, that evidence shows at most that Harris was not there when Hicks was or that Hicks was also involved in the murder of Jones. But it would not show that Harris was not involved.

### (b) Resolution

[16] The court's reasoning that no suppression occurred because the prosecutor did not know about Allgood's statements to investigators was incorrect. Under both federal and state law, the prosecutor had a duty to learn of favorable material evidence known to others acting on the government's behalf in the case. Thus, the State's duty to disclose favorable material evidence existed even if the evidence was known only to police investigators and not to the prosecutor.

Further, the court's summary conclusion that Allgood's statements were not exculpatory did not comply with the applicable standards for evaluating Harris' claims. Favorable evidence includes both exculpatory and impeachment evidence.

Harris alleged in his motion that Allgood's statements would have corroborated his alibi defense and contradicted Hicks'

testimony that he left the murder scene with Harris and drove around with him, disposing of evidence and distributing the money. Harris also alleged that he would have cross-examined Hicks about his contacts with Bass. His trial attorney stated that knowing whether Hicks "was with others or alone in terms of the story that he related" may have undermined Hicks' credibility and reinforced Harris' alibi.

The court did not consider whether Allgood's statements to the officer would have impeached Hicks' credibility. Nor did the court explain why it concluded that Allgood's statements were not "potentially exculpatory information."

As explained, we do not have the bill of exceptions from Harris' trial. Whether the State suppressed material exculpatory information by not disclosing Allgood's statements must be evaluated in the light of the trial evidence.[59] The court's summary conclusion does not satisfy that requirement. Accordingly, we remand the cause for further clarification as to whether Allgood's statements were not exculpatory or would not have impeached Hicks' credibility.

### 4. Record Is Unclear as to Which Motion for Postconviction Relief Court Considered

As previously explained, on January 17, 2008, Harris filed a "Second Verified Motion for Postconviction Relief." In that motion, Harris raised the issue of prosecutorial misconduct for failing to disclose potentially exculpatory information within the possession of Allgood and McClinton.

On November 13, 2010, Harris filed a "Motion for Leave to File Third Amended Motion for Postconviction Relief." In that motion, Harris alleged that the motion was identical to his second motion except that it raised two claims involving Hicks' plea agreement: (1) The prosecutor failed to disclose the true plea agreement, and (2) the prosecutor

---

[59] See *id.* Accord, e.g., *Canales v. Stephens*, 765 F.3d 551 (5th Cir. 2014).

misrepresented or allowed Hicks to misrepresent the nature of his plea agreement. On December 16, the district court granted the motion for leave and allowed Harris to file a third amended motion for postconviction relief. As mentioned previously, the record reflects that Harris failed to file his third amended postconviction motion after the court gave him leave to do so.

At the commencement of the evidentiary hearing in 2013, the district court announced that the matter was before the court on the third amended motion for postconviction relief. When the court announced that it was hearing Harris' third amended motion, the State did not assert that Harris had failed to file the motion. Instead, the State offered a copy of Harris' third amended motion and the court's docket entries, which showed that the court had given Harris leave to file it.

After clarifying the record, the prosecutor stated that the State had not found a record of Harris' most recent motion. But the State did not contend that Harris' claims regarding Hicks' plea agreement were beyond the scope of the pleadings. Instead, it argued that the court should dismiss Harris' postconviction motion under § 29-3003 because the record failed to show that the court had ever dismissed his motions for a new trial and a writ of error coram nobis.

The record further reflects that Harris presented certain evidence that was relevant only to his claims about Hicks' plea agreement. He questioned his trial attorney about Hicks' shooting of Paylor and Hicks' plea agreement in regard to Jones. He submitted exhibits that showed the State's original information charging Hicks with assault, its amended information charging Hicks' with robbery, Hicks' 2011 deposition, Hicks' sentencing hearing, and the court's order sentencing Hicks. The State's only objection to this evidence was that the claim was procedurally barred—not that it was beyond the scope of the pleadings. The court allowed the State to have a continuing objection regarding its procedural bar argument, but overruled the objection. At no point did the State argue

that Harris' evidence was irrelevant to the pleading properly before the court.

However, when the district court issued its order on the merits, the court referenced only that the matter came on for a full hearing on Harris' "Motion for Postconviction Relief." Further, the order addressed Harris' claims for prosecutorial misconduct only for failing to disclose potentially exculpatory information within the possession of Allgood and McClinton. The order was silent as to Harris' claims regarding Hicks' plea agreement.

As a result, we cannot determine from the record whether the district court intentionally or erroneously failed to rule on Harris' claims regarding Hicks' plea agreement. Though an argument can be made that the parties consented to try all of the claims set forth in Harris' third amended motion for postconviction relief, making such determination would be needlessly speculative. The better course is for this matter to be remanded to the district court for clarification as to which motion the court intended to rule on and, if necessary, the entry of an order which dispenses with all of Harris' claims for relief.

### 5. HARRIS' NEW CLAIM OF INEFFECTIVE ASSISTANCE IS PROCEDURALLY BARRED

In Harris' second motion for postconviction relief, he alleged that if his trial attorneys knew about Allgood and his contacts with Hicks or about the statements that Hicks made to McClinton, then they provided ineffective assistance in failing to call Allgood and McClinton as witnesses. The court found that Harris' attorney did not know about information that Allgood or McClinton possessed. That finding was not clearly wrong, and Harris does not argue otherwise. Instead, he argues that his attorney was ineffective in failing to investigate the significance of Allgood after the prosecutor endorsed him as a witness and then stated that she would not call him to testify. This claim was available to Harris when he tendered

his third amended motion, but he did not raise it. It is now procedurally barred.[60]

## VI. CONCLUSION

We conclude that the court properly denied relief on Harris' claim that the State suppressed evidence of McClinton's statements in his affidavit. We conclude that the court applied the wrong standards in denying Harris relief on his claim that the State suppressed Allgood's statements to police by focusing only on the prosecutor's knowledge of Allgood's statements, by failing to consider whether Allgood's statements would have impeached Hicks' credibility, and by failing to examine whether Allgood's statements were material in the light of the trial evidence. Finally, the court erred in failing to accurately set forth which motion for postconviction relief it intended to address.

If the court concludes that the State suppressed material evidence regarding Allgood's statements to police or Hicks' plea agreement, it must evaluate the materiality of that suppression cumulatively. That is, the prejudicial effect of any new suppression must be considered cumulatively with the State's known suppression of the Cass report.

AFFIRMED IN PART, AND IN PART REVERSED AND
REMANDED FOR FURTHER PROCEEDINGS.

HEAVICAN, C.J., not participating.

---

[60] *State v. Phelps*, 286 Neb. 89, 834 N.W.2d 786 (2013).