IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. SANTOS

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

MARIO SANTOS, APPELLANT.

Filed June 4, 2024.   No. A-23-233.

Appeal from the District Court for Douglas County: J RUSSELL DERR, Judge. Affirmed.

Kenneth Jacobs, of Hug & Jacobs, L.L.C., for appellant.

Michael T. Hilgers, Attorney General, and Austin N. Relph for appellee.

PIRTLE, Chief Judge, and RIEDMANN and BISHOP, Judges.

PIRTLE, Chief Judge.

## I. INTRODUCTION

Mario Santos was charged in the district court for Douglas County with two counts of first degree sexual assault on a child and one count of first degree sexual assault. After trial, he was convicted on both counts of sexual assault on a child and acquitted of the other sexual assault charge. However, after the trial concluded, Santos discovered undisclosed evidence pertaining to his two convictions. After Santos filed a motion for new trial, the district court vacated one of his convictions and ordered a new trial to be held but denied the motion as to his other conviction. Santos then filed a second motion for new trial which the district court denied.

On appeal, Santos assigns the district court erred in making an evidentiary ruling at trial and in denying his motions for new trial. He also assigns that his trial counsel was ineffective in a variety of ways. For the reasons that follow, we affirm.

- 1 -

## II. BACKGROUND

In 2016 and 2017, Alma B. and her three children lived in a two-bedroom house in Omaha, Nebraska. While they lived in this home, it was not uncommon for other families to live with them. At various points, the household consisted of Alma and her three children, a woman named Sarai and her five children, Carmen P. and her four children, and another woman and her two children. Additionally, sometime in the summer of 2016, Santos began living in the home as well. With all these people living in the residence, Santos slept on the living room couch with one of Carmen's children, H.B.P.

Santos, born in 1975, held himself out to be a "curandero" which is a type of spiritual healer. In this role, Santos would regularly organize and lead prayer rituals in the basement of the home and in the backyard shed. Alma, Carmen, Sarai, and their children often participated in these ceremonies. The rituals involved Santos giving the participants cigars and having them drink from a wooden cup that contained an undisclosed liquid. While only Santos knew what was in the cup, some of the participants believed it contained alcohol. After drinking from the cup, some of the participants had negative effects that involved vomiting or passing out. Alma reported that there were times she passed out after drinking from the cup and woke up naked feeling "like someone had touched [her] body."

In March 2018, Alma reported to law enforcement that Santos sexually assaulted her from September to November 2016. However, she reported his name as "Mario Benato" so when law enforcement attempted to check his records and locate him, they were unable to do so. Because of that, and length of time between the report and alleged conduct, the investigation did not progress.

Then in November 2018, Alma's son, A.P., disclosed that Santos had sexually assaulted him. On January 8, 2019, A.P. participated in a forensic interview at Project Harmony. At the interview, A.P. was asked about "Mario" and he reported that Santos had abused him.

Additionally, A.P. reported that he previously saw Santos sexually abuse Carmen's son, H.B.P., who had been sleeping on the couch with Santos. Law enforcement located H.B.P. and he participated in a Project Harmony interview. During this interview, H.B.P. also disclosed sexual abuse by Santos. Following H.B.P.'s interview, Santos was arrested on February 11, 2019.

### 1. DISTRICT COURT PROCEEDINGS

On March 7, 2019, the State charged Santos with two counts of first degree sexual assault on a child. Count I alleged that Santos sexually penetrated A.P. and count II alleged he sexually penetrated H.B.P. Law enforcement then discovered evidence regarding a separate incident involving Santos sexually assaulting Alma. Accordingly, Santos' charges were ultimately amended on March 25, 2021, to include an additional third count of first degree sexual assault. The date range for each count alleged the sexual assaults occurred between January 1, 2016, and May 30, 2018. After a series of pretrial motions that are not relevant to this appeal, a jury trial was held from March 19 to March 24, 2021.

At trial, A.P. testified that Santos was living with him and his family when he was around 10 years old. He explained that one night Santos woke him up in his bedroom and took him to the living room. Once there, Santos had A.P. take off his shorts and then undressed himself. A.P. then alleged that Santos had him get on his knees, put his penis in his mouth, and told him to "suck it." Santos proceeded to put his hands on A.P.'s head and thrusted his penis in and out of his mouth.

Afterward, Santos put his penis into A.P.'s butt and thrusted back and forth. A.P. stated that it hurt when Santos put his penis in his butt and that he cried while it happened. A.P. testified that Santos eventually ejaculated into his mouth.

A.P. then explained that he saw Santos do similar things to H.B.P. He stated that he woke up one night to a loud banging and saw Santos putting his penis inside of H.B.P.'s butt. However, on cross-examination, A.P. retracted these statements and said that he never witnessed H.B.P.'s abuse. Instead, he said that he learned of H.B.P.'s abuse from Alma who told him about it on the way to his Project Harmony interview.

H.B.P. then testified and described a separate incident where Santos sexually abused him. This incident occurred at a different residence sometime from October 2015 to May 2017, before H.B.P lived with Alma and her family. At some point during this period, Santos stayed with H.B.P.'s family at this separate residence. H.B.P. recalled that he was 6 or 7 years old when he was alone with Santos one night. During this incident, H.B.P. stated that Santos touched his bottom, pulled down his pants, and then put his penis into his butt. H.B.P. explained that Santos told him afterward to not tell his mother or something bad would happen to him. H.B.P. later told a group of people about this incident that included A.P., Alma, Carmen, and Alma's other son, J.P.B.

J.P.B. then testified at trial. J.P.B. stated he was 13 years old when Santos lived with them. He began by generally describing the rituals Santos organized and led. He stated the first couple of rituals were normal, but strange things began to happen as he continued to participate in them. He described how Santos blew cigar smoke into the participants' faces and circulated the wooden cup filled with what he believed was alcohol.

J.P.B. then explained that during some of these rituals, the participants passed out. He recalled one time when a child drank the liquid causing him to faint. Then one time while a ritual was happening in the shed without him, he peered in and saw Alma unconscious on the floor. He stated that he saw her on the floor but did not do anything because the ritual was still ongoing. He testified that she did not wake up for several hours after this happened.

A couple of weeks after this incident, J.P.B. confronted Santos about the rituals and called him a "devil-worshipper" which angered him. In retaliation, Santos tied him to a chair. While tied to the chair, J.P.B. noticed Alma was unconscious in a bedroom. He testified that she was not moving and looked like she was drugged.

J.P.B. continued to explain that while he was still tied to the chair, Santos grabbed Alma, took off her clothes, rubbed her chest, laid her on her back, and sexually assaulted her in front of him. Throughout this incident, J.P.B. said that Alma remained unconscious. After Santos was finished, he left J.P.B. tied to the chair and went to sleep. J.P.B. was eventually able to untie himself and assisted Alma who woke up around 3 hours later with no memory of the events.

Alma and Carmen also testified at trial. Because Alma and Carmen are both undocumented immigrants, their testimony involved short discussions about U-Visa's or "victim visas." Victim visas are a United States nonimmigrant visa which is set aside for victims of crimes who are willing to assist law enforcement and government officials in the investigation or prosecution of the criminal activity. In short, they permit such victims to enter or remain in the United States when they might not otherwise be able to do so.

During Alma's testimony, the defense asked her whether she knew what a victim visa was and whether she had attempted to change her immigration status since these allegations were made against Santos. Alma responded "no" to both questions. Alma was also asked whether she had consulted an attorney about changing her immigration status and whether anyone at Project Harmony helped her fill out immigration forms. Alma responded that she did not remember. During Carmen's testimony, the defense asked if she knew what a victim visa was, but the district court sustained the State's "[b]eyond the scope" objection so Carmen did not answer the question.

During closing arguments, Santos argued that Alma and Carmen had told their children to falsely accuse him of sexual assault so that they could obtain victim visas to stay in the country. In response, the State argued that the only evidence adduced regarding immigration status or victim visas was Alma's testimony that she was undocumented and did not know what a victim visa was.

Following closing arguments, the district court submitted the case to the jury. The jury found Santos guilty of both counts of first degree sexual assault of a child, but not guilty on the third count alleging first degree sexual assault. The district court accepted the jury's verdict, convicted Santos on counts I and II, and acquitted him of the third.

2. POST TRIAL PROCEEDINGS

On April 27, 2021, about a month after the verdict, Santos filed a motion for new trial. In this motion, he argued that a new trial was warranted on both convictions due to prosecutorial misconduct and the State's failure to disclose evidence. He essentially argued that Alma perjured herself when she denied knowing what a victim visa was because she had been in contact with an attorney to apply for one. Additionally, he claimed the prosecutors knew that Alma's testimony was false because they were aware that she had obtained this attorney before the trial began. Evidence was later adduced that Alma's attorney had emailed the prosecution prior to trial to ask if they could sign off on the visa application. Santos argued a new trial was necessary because the State failed to disclose this information, failed to correct Alma's false testimony at trial, and utilized the false testimony in its closing argument.

After a hearing on this motion, the district court issued an order partially granting the motion and partially denying it. In relation to count I, which related to A.P.'s allegations, the court determined the State's use of Alma's perjured testimony constituted prosecutorial misconduct and prejudiced Santos' right to a fair trial. However, for count II, which related to H.B.P.'s allegations, the court determined Santos failed to demonstrate he was prejudiced by the perjured testimony and non-disclosure because the evidence did not "go to the credibility of witnesses whose testimony form[ed] the bases of his conviction." Accordingly, the court ordered a new trial on count I, but did not alter Santos' conviction on count II.

On August 31, 2021, Santos filed a second motion for new trial. In this motion, he argued that a new trial was warranted on his conviction for count II because he had discovered undisclosed evidence that Carmen had a pending victim visa application at the time of trial. Santos learned that an attorney, Jason Finch, represented Carmen in this endeavor and uncovered the application after subpoenaing his office. This evidence demonstrated that Carmen finalized an application for a victim visa in 2020, and that the Omaha police department had approved it after Carmen assisted law enforcement in a different criminal case involving the victimization of her daughter.

In its order denying the motion, the district court articulated that Carmen's victim visa application had been filed with the Department of Homeland Security 7 months before Santos' trial began and was awaiting approval while the trial ensued. The court also concluded that the State was never in possession of Carmen's application, that no one working on Santos' investigation or prosecution was familiar with Carmen's application, and that the Omaha police department did not have a system in place that allowed the sharing of information related to victim visas. Further, the court reasoned that the defense could have discovered Carmen's victim visa application prior to the trial if it had been reasonably diligent. Due to these reasons, the court determined Santos was unable to prove prosecutorial misconduct or a *Brady* violation as to count II and denied his motion.

On July 19, 2022, a sentencing hearing was held. On Santos' sole remaining conviction for first degree sexual assault on a child, the district court sentenced him to 48 to 50 years' imprisonment. Following this hearing, the State voluntarily dismissed the pending charge it had refiled following the district court's grant of a new trial on count I.

Santos pursued a direct appeal in this matter, but the appeal was dismissed because his attorneys did not file the appeal within the 30-day time limit. Santos then moved for postconviction relief where he alleged that he received ineffective assistance of counsel due to his attorneys' untimely filing of his appeal. The district court granted his request for postconviction relief in the form of a new direct appeal. This is that appeal.

## III. ASSIGNMENTS OF ERROR

Restated, Santos assigns the district court erred (1) by sustaining the State's objection to Carmen's testimony regarding the victim visa; (2) by not granting his first motion for new trial as to both counts; and (3) for not granting his second motion for new trial as to count II.

Santos also assigns his trial counsel was ineffective by (1) failing to properly investigate and discover evidence regarding Alma and Carmen's victim visas; (2) failing to depose two of Sarai's children prior to trial; and (3) not filing a motion to sever the charges against him.

## IV. STANDARD OF REVIEW

Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. *State v. Berger*, 31 Neb. App. 379, 980 N.W.2d 634, (2022).

An appellate court applies a de novo standard when reviewing a trial court's dismissal of a motion for new trial without conducting an evidentiary hearing, but it applies an abuse of discretion standard of review to appeals from motions for new trial denied after an evidentiary hearing. *State v. Boppre*, 315 Neb. 203, 995 N.W.2d 28 (2023). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015).

Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law. *State v. Anderson*, 305 Neb. 978, 943 N.W.2d 690 (2020). In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether

counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance. *Id.*

## V. ANALYSIS

### 1. OBJECTION TO CARMEN'S TESTIMONY REGARDING VICTIM VISAS

Santos first assigns the district court erred in sustaining the State's "[b]eyond the scope" objection to Santos asking Carmen whether she knew what a victim visa was. Santos argues that Carmen's knowledge about victim visas was relevant and should have been allowed. He essentially contends that if she had answered the question affirmatively, he would have been better able to argue that Alma and Carmen conspired against him to secure victim visas.

Pursuant to Neb. Rev. Stat. § 27-103(1)(b) (Reissue 2016), Neb. Evid. R. 103(1)(b), error may not be predicated upon a ruling which excludes evidence unless a substantial right of the party is affected, and the substance of the evidence was made known to the judge by offer or was apparent from the context within which questions were asked. *State v. Schreiner*, 276 Neb. 393, 754 N.W.2d 742 (2008). Therefore, to predicate error upon a ruling of the court refusing to permit a witness to testify, or to answer a specific question, the record must show an offer to prove the facts sought to be elicited. *Id.* The offer need not be a detailed recitation of the excluded testimony but must be enough to provide the general nature of the testimony so that an appellate court can properly review its effect. *Birkel v. Hassebrook Farm Serv.*, 219 Neb. 286, 363 N.W.2d 148 (1985).

Santos made no offer of proof concerning Carmen's proposed testimony. This is not surprising given his second motion for new trial where he asserted that the evidence pertaining to Carmen's victim visa had not been disclosed. However, despite this unique situation, it remains that no one knows how Carmen would have answered the question if she had been allowed to respond. Therefore, without an offer of proof, we determine this assignment of error fails.

But even if we presumed the district court erred in sustaining the objection and that a truthful response from Carmen would have indicated that she knew what a victim visa was, we determine any error by the district court in excluding this testimony was harmless. Harmless error exists when there is some incorrect conduct by the trial court which, on review of the entire record, did not materially influence the jury in reaching a verdict adverse to a substantial right of the defendant. *State v. Pangborn*, 286 Neb. 363, 836 N.W.2d 790 (2013).

In his appellate brief, Santos asserts that regardless of Carmen's answer to the question, the line of inquiry would have likely ceased. Therefore, even if Carmen had responded that she knew what a victim visa was, the only evidence pertaining to victim visas would have been Carmen's response and Alma's testimony that she did not know what they were. Accordingly, the record would not have contained any evidence as to what a victim visa was, who was eligible for one, or what the process was to obtain one. With this, even when assuming Carmen would have answered yes to the question, we cannot say that her knowing what a victim visa was, without any other evidence, would have provided Santos a stronger defense that materially altered the jury's verdict.

We conclude that without an offer of proof, this assignment of error fails. However, even if we assumed the district court erred in excluding a potential affirmative response by Carmen, that error was harmless.

## 2. First Motion for New Trial

Santos next assigns the district court erred in partially denying his motion for new trial and not vacating his conviction on count II. As there was an evidentiary hearing on Santos' motion for new trial, the applicable standard of review is whether the district court abused its discretion in partially denying the motion. See *State v. Boppre*, 315 Neb. 203, 995 N.W.2d 28 (2023).

In the district court's order on Santos' motion, it analyzed whether Santos' rights were violated under *Napue v. People of State of Ill.*, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959) or *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). In *Napue*, the U.S. Supreme Court held that the knowing use of false testimony by a prosecutor in a criminal case violates the defendant's right to due process. And in *Brady*, it held that the prosecution has a duty to disclose all favorable evidence to a criminal defendant prior to trial.

In upholding Santos' conviction on count II, the district court found his rights were not violated under *Napue* or *Brady*. The district court explained that while the State's failure to correct Alma's false testimony constituted prosecutorial misconduct under *Napue* and prejudiced his conviction on count I, it did not prejudice his conviction on count II. In coming to this conclusion, the court determined the perjured testimony did not undercut "the credibility of witnesses whose testimony form[ed] the bases of his conviction." Therefore, it concluded the evidence did not prejudice Santos' conviction on count II and therefore did not violate his rights under *Napue* or *Brady*.

On appeal, it appears Santos only takes issue with the district court's finding that the State's misconduct did not constitute a *Brady* violation. There are three primary components of a *Brady* violation. *State v. Harris*, 296 Neb. 317, 893 N.W.2d 440 (2017). First, the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching. *Id.* Second, the State must have suppressed the evidence, either willfully or inadvertently. *Id.* Third, prejudice from the suppression must have ensued. *Id.*

Santos asserts that the undisclosed evidence of Alma's victim visa application prejudiced him because that evidence could have been used to exculpate himself and to impeach Alma's false testimony. Under Neb. Rev. Stat. § 29-1912 (Cum. Supp. 2022), Nebraska's primary discovery statute in criminal cases, whether a prosecutor's failure to disclose evidence results in prejudice depends on whether the information sought is material to the preparation of the defense, meaning that there is a strong indication that such information will play an important role in uncovering admissible evidence, aiding preparation of witnesses, corroborating testimony, or assisting impeachment or rebuttal.

We determine the district court did not abuse its discretion in finding that the State's failure to disclose evidence of Alma's visa application did not prejudice Santos' conviction on count II under *Brady*. We come to this conclusion because Alma was not related to that allegation of sexual assault.

Count II dealt with the allegation that Santos sexually assaulted H.B.P. The record reflects that the evidence supporting Santos' conviction for sexually assaulting H.B.P. did not come from Alma or her children. The only time Alma testified about H.B.P.'s assault was when she explained that Sarai had told her about it previously and that she had informed someone at Project Harmony

about it when she took A.P. there for his forensic interview. And while A.P. originally testified that he witnessed H.B.P. being abused, he retracted that statement on cross-examination.

The evidence that supported Santos' conviction on count II was not impacted by the revelation of Alma's visa application. The overwhelming majority of the supporting evidence came from the detective who transported H.B.P. to Project Harmony and observed his interview, the forensic interviewer who conducted his interview, the mental health practitioner who worked with him following his disclosure, the nurse practitioner who conducted his medical examination, Carmen, and H.B.P.'s own testimony. While evidence of Alma's visa application may have been used to impeach her and A.P., it would not have had any meaningful impact on the testimonies of those who provided most of the evidence regarding H.B.P.'s abuse. As such, we believe the district court's decision that Santos was not prejudiced by the undisclosed evidence of Alma's application was not clearly untenable or unreasonable. Therefore, we conclude that the district court did not abuse its discretion in denying Santos' first motion for new trial as to count II.

### 3. SECOND MOTION FOR NEW TRIAL

Santos next assigns the district court abused its discretion by denying his second motion for new trial. Santos filed his second motion for new trial after discovering information that Carmen had a pending victim visa application while his trial ensued.

In denying the motion, the district court essentially found that Santos was unable to demonstrate prosecutorial misconduct because there was no evidence that the prosecutors or any law enforcement officer connected to the case was aware of the visa application. It then found that Santos was unable to prove any of the three *Brady* elements because Carmen's application was already filed prior to trial and had "nothing whatsoever" to do with Santos or any alleged motive by Carmen to testify against him. As such, it determined the evidence had "no perceivable impeachment value." More so, the court explained in great detail how evidence of Carmen's application was not material because the record contained substantial evidence supporting Santos' conviction on count II. Even further, the court found that with reasonable diligence, Santos could have discovered the evidence on his own.

In Santos' argument he blends two related, but different, propositions of law. He contends that while the district court found that Carmen's visa application had no impeachment value under *Brady*, it failed to include any discussion as to whether the evidence was exculpatory. He asserts that when viewing Carmen's visa application in this light, the *Brady* elements are met because the evidence helps prove his theory that Alma and Carmen conspired to falsely accuse him so they could obtain victim visas. Intertwined in this argument, he also vaguely asserts that Carmen's visa application constituted newly discovered evidence that was so substantial that a different result might have occurred it if was previously discovered. We reject both arguments.

As stated earlier, there are three primary components of a *Brady* violation. *State v. Harris*, 296 Neb. 317, 893 N.W.2d 440 (2017). First, the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching. *Id.* Second, the State must have suppressed the evidence, either willfully or inadvertently. *Id.* Third, prejudice from the suppression must have ensued. *Id.*

Separately, Neb. Rev. Stat. § 29-2101 (Reissue 2016) allows for a new trial upon the discovery of new material evidence. To obtain a new trial based on newly discovered evidence, a

defendant must show that the new evidence could not with reasonable diligence have been discovered and produced at trial. *State v. Krannawitter*, 305 Neb. 66, 939 N.W.2d 335 (2020). Additionally, the defendant must show the evidence is so substantial that a different result may have occurred. *Id.* In other words, the defendant must show that if the evidence had been admitted at the former trial, it probably would have produced a substantially different result. *Id.*

We determine the district court did not abuse its discretion in denying Santos' second motion for new trial. The evidence of Carmen's victim visa was neither prejudicial to Santos' conviction for count II under *Brady's* third element nor was it newly discovered evidence that was so substantial that, if it had been known about at trial, it would have changed the outcome of the proceedings.

We come to these conclusions because the evidence that Carmen had applied for a victim visa in relation to a separate incident involving a different defendant, a different victim, and different allegations would not have provided the exculpatory evidence Santos asserts. While the evidence might have shown that Carmen was aware of the victim visa process, it did not provide any motive for her to conspire against Santos with Alma to obtain immigration benefits. In fact, evidence of Carmen's completed victim visa application would have had more value to counter Santos' main theory of defense than to discredit Carmen and H.B.P.'s testimonies. It would have shown that Carmen had already done everything to obtain a victim visa and put into question why she needed to falsely accuse Santos to get one when she already had an application pending. We therefore conclude the district court did not abuse its discretion in denying Santos' second motion for new trial.

### 4. Ineffective Assistance of Counsel

Santos next assigns his trial counsel was ineffective for (1) failing to properly investigate and discover evidence regarding Alma and Carmen's victim visas; (2) failing to depose two of Sarai's children; and (3) not filing a motion to sever the separate charges against him.

When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record; otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding. *State v. Betts*, 31 Neb. App. 737, 989 N.W.2d 441 (2023). The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. *Id.* The determining factor is whether the record is sufficient to adequately review the question. *Id.*

To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Betts, supra.* To show that counsel's performance was deficient, the defendant must show counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. *Id.* To show prejudice under the prejudice component of the *Strickland* test, the defendant must demonstrate a reasonable probability that but for his or her counsel's deficient performance, the result of the proceeding would have been different. *State v. Betts, supra.* A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

### (a) Failure to Discover Alma and Carmen's Visa Applications

Santos assigns his trial counsel was ineffective for failing to properly investigate and discover evidence of Alma and Carmen's victim visa applications prior to trial.

We determine the record is sufficient to resolve this claim on direct appeal and conclude that Santos did not suffer prejudice from his trial counsel failing to discover Alma and Carmen's victim visa applications. We first note that when analyzing whether Santos was prejudiced by the alleged failures of his trial counsel, we only look to his conviction on count II. Because Santos was acquitted of count III and his conviction on count I was vacated and the renewed charge was later dismissed by the State, count II is all that remains and, therefore, is the only conviction that he could have suffered prejudice in relation to.

With this framework, we conclude that Santos' trial counsel failing to discover evidence of Alma's visa application did not prejudice him because this evidence would not have affected the vast majority of evidence that supported his conviction on count II. Even if Santos possessed evidence of Alma's application at trial and used that information to successfully impeach Alma and A.P., there still would have been substantial evidence to support Santos' conviction. Therefore, we cannot say that there was a reasonable probability that but for Santos' counsel failing to discover Alma's visa application, the result of the proceeding would have been different.

Similarly, we determine Santos' trial counsel failing to discover evidence of Carmen's visa application did not prejudice his conviction. As discussed, because Carmen's visa application had been finalized prior to the start of the trial, its existence provided little to no value to Santos' defense. While Santos argues that prior knowledge of Carmen's application would have allowed him to ask more pointed questions concerning her visa, he fails to provide any details as to how that would have benefited him. Therefore, we determine there was not a reasonable probability that but for Santos' counsel's failing to discover Carmen's visa application, the result of the proceeding would have been different.

### (b) Failure to Depose Witnesses

Santos next argues that his trial counsel was ineffective for failing to depose two of Sarai's children, K.A. and R.A., who lived in Alma's house around the time of A.P.'s sexual abuse. He essentially asserts that because these children lived in the same home as A.P. when he was abused and were not called by the State as witnesses, their testimony would have provided exculpatory evidence that the abuse did not occur.

We determine the record is sufficient to resolve this issue on direct appeal. Beyond the flaws in Santos' argument that two children never seeing abuse, which was alleged to have occurred in the middle of the night, equates to that abuse not occurring, Santos' claim fails because K.A. and R.A. did not live with H.B.P. at the time of his abuse. The evidence showed that Santos abused H.B.P. prior to his family living with Alma, Sarai, and their children. Because the evidence demonstrated that H.B.P.'s abuse did not occur while he was living with K.A. and R.A., their testimony would not have provided any insight as to whether Santos sexually assaulted H.B.P. Accordingly, Santos' trial counsel was not deficient in failing to depose K.A. and R.A. and Santos did not suffer any prejudice as a result.

## (c) Failure to Sever Counts

Santos next assigns his trial counsel was ineffective for failing to file a motion to sever the three counts.

There is no constitutional right to a separate trial. *State v. Garcia*, 315 Neb. 74, 994 N.W.2d 610 (2023). Instead, the joinder or separation of charges for trial is governed by Neb. Rev. Stat. § 29-2002 (Reissue 2016). Summarized, whether offenses were properly joined under § 29-2002 involves a two-stage analysis: (1) whether the offenses were sufficiently related so as to be joinable and (2) whether the joinder was prejudicial to the defendant. *State v. Garcia, supra.* Joined charges do not usually result in prejudice if the evidence is sufficiently simple and distinct for the jury to easily separate evidence of the charges during deliberations. *State v. Benson*, 305 Neb. 949, 943 N.W.2d 426 (2020). Prejudice from joinder cannot be shown if evidence of one charge would have been admissible in a separate trial of another charge. *Id.* There is a strong presumption against severing properly joined counts. *State v. Bedford*, 31 Neb. App. 339, 980 N.W.2d 451 (2022*).*

Santos asserts the State's evidence was not sufficiently simple and the charges were not adequately connected to warrant a joint trial. He then essentially contends his counsel's failure to sever the charges prejudiced him because the cumulative effect of the jury hearing that he had committed multiple sexual assaults unfairly prejudiced the jury against him. As such, Santos asserts that if the State had been unable to present evidence of him committing multiple assaults, the jury could have come to a different conclusion.

The State asserts Santos did not suffer prejudice as a result of his charges being tried together because the evidence of each assault would have been admissible in separate trials pursuant to Neb. Rev. Stat. § 27-414 (Reissue 2016). Section 27-414(1) provides:

> In a criminal case in which the accused is accused of an offense of sexual assault, evidence of the accused's commission of another offense or offenses of sexual assault is admissible if there is clear and convincing evidence otherwise admissible under the Nebraska Evidence Rules that the accused committed the other offense or offenses.

Thus, under § 27-414, assuming that notice and hearing requirements are met and the evidence survives a more-probative-than-prejudicial balancing test, evidence of prior sexual assaults are admissible if proved by clear and convincing evidence. *State v. Lierman*, 305 Neb. 289, 940 N.W.2d 529 (2020). Clear and convincing evidence means that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved. *Gatzemeyer v. Knihal*, 25 Neb. App. 897, 915 N.W.2d 630 (2018).

We determine the record is sufficient to review this question on direct appeal. We begin by analyzing whether count I and count II were properly joined and then analyze whether it was proper to also join count III.

We determine that Santos did not suffer prejudice as a result of count I and count II being tried together because evidence of each assault would have been admissible in separate trials. Based on our review of the evidence produced at trial, we believe evidence of each sexual assault would have been admissible under § 27-414 because the evidence would have supported a finding that Santos committed both sexual assaults by a clear and convincing standard.

The evidence supporting A.P.'s sexual assault came primarily from his own account. He testified about the timeline of Santos living in his house and where he slept while he stayed there. He provided a detailed account of the abuse and identified Santos as the perpetrator. He described that Santos woke him up in the middle of the night, relocated him to the living room where Santos slept, and had him take off his shorts. He further recalled that Santos took off his own shorts, told him to get on his knees, and then commanded him to perform oral sex on him before anally penetrating him. A.P. was able to describe Santos' hands on his head, the positions of their bodies during the incident, how Santos thrusted back and forth, his own in-time reaction to feeling pain and crying, and Santos ejaculating into his mouth.

Similarly, much of the evidence supporting H.B.P.'s sexual assault came from his specific recollection of the abuse. H.B.P. recalled what grade he was in when the abuse occurred, the location of the house it occurred in, the fact it occurred in the basement, the position of their bodies while it happened, how Santos' body moved, and that Santos told him not to tell his mother afterward. He also identified Santos as his abuser during his forensic interview and at trial.

Additionally, H.B.P. provided a similar account to the nurse practitioner that medically examined him. He told her that "Mario" had touched the inside of his butt with his private when he was 5 years old. Further, the therapist who worked with H.B.P. following his disclosure indicated that he exhibited symptoms of a child who had suffered abuse. She described how H.B.P. would have flashbacks, felt nervous, and often became inconsolably sad. She also explained how he displayed certain regressive behaviors, such as accidents at night and anxiety of going to the bathroom by himself. With these behaviors, she diagnosed H.B.P. with post-traumatic stress disorder and commented on how difficult it was for him to disclose his trauma.

Further, there was no indication that A.P. and H.B.P. talked to one another about their abuse or that they were influenced by anyone to make their disclosures. Their accounts display similar details of Santos targeting young boys with whom he was residing and assaulting them in the middle of the night. Because the State would have been able to prove that these sexual assaults occurred by clear and convincing evidence, evidence of each assault would have been admissible at both trials pursuant to § 27-414 if count I and II were tried separately. Therefore, Santos is unable to show that he was prejudiced by the joinder of these charges.

For count III, we do not need to consider whether the evidence of Santos' alleged sexual assault of Alma would have been admissible in separate trials. We determine the evidence supporting count III was simple and distinct enough from the evidence of the other offenses for the jury to separate the charges and associated evidence.

As described, count I and count II involved allegations that Santos sexually assaulted young boys in the middle of the night by coercing them into sexual acts. Those accounts came from the children themselves, along with various professionals who worked with H.B.P. In contrast, count III involved an allegation that Santos sexually assaulted an unconscious adult woman in front of her child who was tied to a chair. As the facts involved are disparate, we believe the jury could easily separate evidence of these charges during deliberations.

And as was demonstrated, the jury finding Santos not guilty on count III indicates that the jury was, in fact, able to consider each count individually. The Nebraska Supreme Court has repeatedly signaled that when a defendant is found guilty on some charges, but not guilty on others, the defendant cannot show the joinder of the charges prejudiced them because the jury

demonstrated that it was able to consider the counts individually. See *State v. Bedford*, 31 Neb. App. 339, 980 N.W.2d 451 (2022). See, also, *State v. Knutson*, 288 Neb. 823, 852 N.W.2d 307 (2014). We therefore determine Santos did not suffer prejudice by the joinder of count III with counts I and II.

## VI. CONCLUSION

We conclude the district court did not abuse its discretion in sustaining the State's objection regarding Carmen's knowledge of victim visas because Santos did not make an offer of proof. The district court also did not abuse its discretion in denying Santos' motions for new trial as to count II because Santos was not prejudiced by Alma's perjured testimony and the nondisclosure of her and Carmen's visa applications.

AFFIRMED.